# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLUB ONE CASINO, INC., dba CLUB ONE CASINO; GLCR, INC., dba THE DEUCE LOUNGE AND CASINO,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; RYAN ZINKE, in his official capacity as Secretary of the Interior; and MIKE BLACK in his official capacity as Acting Assistant Secretary of the Interior – Indian Affairs,<br><br>Defendants. | CASE NO. 1:16-cv-01908-AWI-EPG<br><br>**ORDER DENYING PLAINTIFFS' MOTION TO SUPPLMENT THE ADMINISTRATIVE RECORD** |

## I. Introduction

Plaintiffs Club One Casino and The Deuce Lounge (collectively "Plaintiffs" or "Club One") bring the instant Administrative Procedures Act ("APA") challenge to the issuance of Secretarial Procedures by the United States Department of the Interior, the Secretary of the Interior, and the Assistant Secretary for Indian Affairs (collectively "DOI" or "Federal Defendants") permitting the North Fork Rancheria of Mono Indians ("North Fork") to conduct tribal gaming on a 305.49 acre parcel of land in Madera County, California (the "Madera Site"). Complaint, Doc. 1 ("Compl.") at ¶ 1. The substance of the challenge is directed at whether the

1

Federal Defendants adequately considered whether North Fork exercised jurisdiction over the Madera Site for purposes of the Indian Gaming Regulatory Act ("IGRA"), 29 U.S.C. § 2701, et seq. To be very clear, the scope of this action is limited to reviewing to Secretary's prescription of gaming procedures for North Fork on the Madera Site; the Secretary's 2012 fee-to-trust determination is not challenged.

Plaintiffs moved to supplement the administrative record. On September 25, 2017, the Court authorized additional briefing "regarding what it means for an Indian tribe to exercise jurisdiction over Indian lands for purposes of IGRA." Doc. 30 at 8. Both parties submitted supplemental briefing. For the following reasons, Plaintiffs' motion to supplement the administrative record will be denied.

## II. Factual Background

This Court set out the factual background regarding this action in its prior order. Doc. 30 at 2-4.

## III. Legal Standard

As the Court set out in its prior order, the scope of judicial review and the process for determining the adequacy of an administrative record in the APA context is as follows:

> [T]he scope of judicial review is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The administrative record is "not necessarily those documents that the agency has compiled and submitted as 'the' administrative record." *Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (internal citation omitted). Rather, " '[t]he whole record' includes everything that was before the agency pertaining to the merits of the decision." *Portland Audubon Soc'y v. Endangered Species Comm*., 984 F.2d 1534, 1548 (9th Cir. 1993) (internal citation omitted). "The 'whole' administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson*, 885 F.3d at 555 (emphasis added).
>
> [¶¶]
>
> However, the record does not include "every scrap of paper that could or might have been created" on a subject. *TOMAC v. Norton*, 193 F. Supp. 2d 182, 195 (D.D.C. 2002).

2

> A broad application of the phrase "before the agency" would undermine the value of judicial review: Interpreting the word "before" so broadly as to encompass any potentially relevant document existing within the agency or in the hands of a third party would render judicial review meaningless. Thus, to ensure fair review of an agency decision, a reviewing court should have before it neither more nor less information than did the agency when it made its decision.
>
> *Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006) (internal citations and quotations omitted). …
>
> An agency's designation and certification of the administrative record is entitled to a "presumption of administrative regularity." *McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007). This presumption requires courts to presume that public officials have properly discharged their official duties. *Id*. It is the burden of the party seeking to supplement the record to overcome this presumption by producing clear evidence to the contrary. *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993); *McCrary*, 495 F. Supp. 2d at 1041.

*Natural Resources Defense Council v. Zinke*, 2017 WL 3705108, *2-3 (E.D. Cal. Aug. 28, 2017). A plaintiff can overcome the presumption of regularity in four situations: "(1) if admission [of supplemental evidence] is necessary to determine whether the agency has considered all relevant factors and has explained its decision [;] (2) if the agency has relied on documents not in the record[;] (3) when supplementing the record is necessary to explain technical terms or complex subject matter[;] or (4) when plaintiffs make a showing of agency bad faith." *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005) (citing *Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

### IV. Discussion

It is Plaintiffs' position that supplementation of the administrative record is necessary to demonstrate that the Federal Defendants failed to consider whether North Fork exercised territorial jurisdiction over the Madera Site on the date when Secretarial Procedures were prescribed. Plaintiffs argue that the supplementation material falls within the first *Lands Council* category—evidence necessary to show that the Federal Defendants failed to consider all relevant factors in coming to its decision. *See Lands Council*, 395 F.3d at 1029. Specifically, Plaintiffs seek supplementation of the record to include the following documents:

1) The Declaration of James N. Cordova attesting to the chain of title through the certified

deeds that trace the title to the [Madera Site] from statehood in 1850 to the transfer to the federal government in 2013; these deeds are part of the official records of Fresno and Madera Counties [(the "Chain of Title")];

2) Two Records of Decision ("RODs") both issued by [D]efendants, with respect to the [Madera Site];

    a) The ROD issued in 2011 as to the so-called "2719 Determination" that the [Madera Site] can be taken into trust for possible future use as a casino gaming site under [IGRA] [(the "2011 IGRA ROD")]; and

    b) The ROD issued in 2012 as to the decision to take the land into trust [under the Indian Reorganization Act ("IRA")] [(the "2012 IRA ROD")].

3) Excerpts from public filings posted on the SEC website documenting ownership of the [Madera Site] by Station Casinos, a Nevada gaming corporation, immediately prior to the transfer to the United States.[fn]

Doc. 22 at 3.

As the Court made clear in its last order,

> Whether the Court should allow supplementation of the record with each of those documents turns on the success of Plaintiffs' substantive argument—that "any suggestion that [North Fork] has territorial jurisdiction over the subject parcel is completely unsupported by the … record." Doc. 22 at 6. It is undisputed that the Secretary can proscribe procedures for gaming only if the contemplated gaming activities would "be conducted on the Indian lands over which the Indian tribe has jurisdiction." 25 U.S.C. § 2710(d)(7)(B)(vii)(II); *see also* 25 C.F.R. § 291.11 (governing Secretarial Procedures when the state has invoked sovereign immunity from good faith negotiation suit). The dispute between the parties regards the requisite finding that must be made for the Secretary to conclude that the Madera Site was Indian land over which North Fork exercised jurisdiction.

Doc. 30 at 6. Based on the substantive issue identified, the Court invited the parties to submit briefing regarding "what it means for an Indian tribe to exercise jurisdiction over Indian lands for purposes of IGRA." Doc 30 at 8.

A. Summary of the Parties' Positions

Factually, there is no disputed that the Madera Site was taken into trust for North Fork on February 5, 2013. The parties further agree that the Madera Site was not reserved by the United States for North Fork when the State of California was admitted to the Union, that the Madera Site was not acquired pursuant to the Enclaves Clause of the Constitution, and that the State of

4

California did not expressly cede jurisdiction over the land to the United States.

Legally, the parties are in agreement that, at least in the ordinary case, acquisition of an ownership interest in land by the United States only impacts title to that land; it does not divest the State of jurisdiction over that land. *See Silas Mason Co v. Tax Com'n of State of Washington*, 302 U.S. 186, 197 (1937). The parties are equally agreed that "Congress can acquire exclusive or partial jurisdiction over lands within a State by the State's consent or cession…." *Kleppe v. New Mexico*, 426 U.S. 529, 542-543 (1976). The parties disagree regarding the jurisdictional impact of the Secretary taking the Madera Site into trust for North Fork through the authority delegated to the Secretary by the IRA.

Plaintiffs' position is that North Fork must have "acquired territorial jurisdiction of the Madera" Site in order to exercise jurisdiction over the land within the meaning of 25 U.S.C. §§ 2710(d)(3)(A) and 2710(d)(7)(B)(vii)(II). Doc. 32 at 2. Plaintiffs contend that territorial jurisdiction over land within a state's territorial jurisdiction can only be acquired in three situations: (1) when the land "is reserved by the United States at the time the state is admitted into the Union; (2) when "[t]he land is acquired pursuant to the Enclaves Clause;" or (3) when the state expressly cedes jurisdiction to the United States. Doc. 32 at 6. In order to make a showing in first situation, Plaintiffs argue, a historical review of the property is required. Doc. 32 at 3. To that end, Plaintiffs seek to supplement the administrative record with the aforementioned documents.

Plaintiffs also contend that, beyond the inquiry regarding North Fork's exercise of jurisdiction over the land, the supplementation material is also necessarily considered in determining whether North Fork exercised "governmental power over the land." *See* Doc. 32 at 13-15; 25 U.S.C. § 2703(4)(B); 25 C.F.R. § 502.12(b).[1]

Defendants' response to the Court's question regarding the meaning of the phrase is that "[j]urisdiction for purposes of IGRA has no special meaning…. Thus the question is: does a tribe have jurisdiction over trust land?" Doc. 31 at 2. That answer is less than helpful.[2] In fact, it

---

[1] This basis for supplementation of the administrative record was absent from Plaintiffs' original motion.

[2] In the Indian Reorganization Act ("IRA") context, the Ninth Circuit commented that "[t]he phrase 'under Federal jurisdiction,' considered on its own, does not have an obvious meaning. 'Jurisdiction, it has been observed, is a word

doesn't even appear to be a correct summary of the Secretary's actual position. It is clear from the remainder of Defendants' briefing that its position is that it is unnecessary for a tribe to obtain jurisdiction through formal cession of jurisdiction by the State to the tribe or to the United States in order to satisfy IGRA's jurisdiction over land requirement. Rather, the Secretary argues, by nature of the Secretary taking the Madera Site into trust for the North Fork by the means prescribed by the IRA, North Fork exercises jurisdiction over the trust land. Doc. 31 at 7. In essence, the Secretary argues that because the Madera Site is appropriately set aside for use by North Fork, it is under the North Fork's jurisdiction within the meaning of IGRA.

B. IGRA – Jurisdiction Over Land and Governmental Power Requirements

An Indian tribe may engage in gaming under IGRA only on "Indian land" over which the tribe has jurisdiction. 25 U.S.C. § 2710(d)(3)(A), (d)(7)(B)(vii)(II). Under IGRA, the term "Indian lands" means (A) all lands within any Indian reservation, and (B) land over which an Indian tribe exercises governmental power and that is either (1) held in trust by the United States for the tribe, or (2) held by a tribe or individual subject to restriction by the United States against alienation. 25 U.S.C. § 2703(4); 25 C.F.R. 502.12. Jurisdiction over the land and governmental power[3] over land are both necessary conditions for a tribe to conduct gaming under IGRA.

C. Jurisdiction Over Indian Land

In order to determine whether any of the proposed supplementation material is necessary to determine whether the Secretary erroneously determined that the Indian tribe exercised jurisdiction over the Madera Site, the Court must set out how an Indian tribe exercises jurisdiction over land.

Plaintiffs' understanding of the limited ways in which the United States can obtain jurisdiction from a state is flawed. Fundamentally, Congress has the power to regulate commerce

---

of many, too many, meanings.'" *County of Amador v. United States Department of the Interior*, 872 F.3d 1012, 1026 (2017); *see also Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*, 830 F.3d 552, 564 (D.C. Cir. 2016) ("'[J]urisdiction' is a term of extraordinary breadth.")

[3] A separate showing of governmental power is not required when the land designated for gaming is within an Indian tribe's reservation. Such is not the case here.

with the Indian Tribes. Constitution Art. 1 § 8, cl. 3. The "central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989). "Congress … has the power to create tribal rights within a State without the State's consent." *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001). At least partially under that power, Congress enacted the IRA, Section 5 of which authorizes Secretary of the Interior "to acquire … any interest in lands … [in] trust … for purpose of providing land for Indians." 25 U.S.C. § 5108[4]; *see Cherokee Nation v. S. Kansas Ry. Co.*, 135 U.S. 641, 656-659 (1890) ("The United States may exercise the right of eminent domain, even within the limits of the several states, for purposes necessary to the exception of powers granted by the constitution."); *Upstate Citizens for Equality, Inc. v. United States*, 841 F.3d 556, 568 (2nd Cir. 2016).

"Indian tribes are 'domestic dependent nations' that exercise 'inherent sovereign authority.'" *Michigan v. Bay Mills Indian Cmty.*, 134 S.Ct. 2024, 2030 (2014) (quoting *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831)); *see McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 172 (1973) ("The Indian sovereignty doctrine … provides a backdrop against which the applicable treaties and federal statutes must be read.") As a result of that sovereignty and federal plenary authority over governing Indian tribes, "primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States." *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 527 n.1 (1998) (citing *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998)); *see* 18 U.S.C. § 1151 (defining Indian country for purposes of criminal jurisdiction); *Cohen's Handbook of Federal Indian Law* § 3.04[2][c][iv], at 198. Land taken into trust by the United States for the benefit of an Indian tribe is Indian country. *Oklahoma Tax Com'n v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 511 (1991) (citing *United States v. John*, 437 U.S. 634, (1978)); *United States v. McGowan*, 302 U.S. 535, 538-539 (1938) (Regardless of the nomenclature used in designating land set aside for an Indian tribe, land is "Indian country [when] it [is] validly set apart for the use of the Indians…."); *South Dakota v. Dept. of Interior,*

---

[4] This Section was previously codified at, and is still regularly referred to as, 25 U.S.C. § 465.

7

665 F.3d 986, 990 (8th Cir. 2012); *United States v. Roberts*, 185 F.3d 1225, 1131-1132 (10th Cir. 1999) *Langley v. Ryder*, 778 F.3d 1092, 1095 (5th Cir. 1985); *Cheyenne-Arapaho Tribes of Oklahoma v. State of Oklahoma.*, 618 F.2d 665, 667-668 (10th Cir. 1980).

Plaintiffs suggest that a transfer of land pursuant to Section 5108 *only* impacts title to land, not jurisdiction over it. Plaintiffs are wrong. "When the federal government takes land into trust for an Indian tribe, the state that previously exercised jurisdiction over the land cedes *some* of its authority to the federal and tribal governments." *Upstate Citizens for Equality, Inc. v. United States*, 841 F.3d at 569 (emphasis added); *see Venetie*, 552 U.S. at 528-529 ("Congress [can] exercise jurisdiction over" lands "validly set apart for the use of the Indians" that are "under the superintendence of the" United States.); *see also Stop the Casino 101 Coalition v. Brown*, 230 Cal.App.4th 280, 289 (Cal. Ct. App. 2014) (citing *City of Roseville v. Norton*, 219 F.Supp.2d 130 (D.D.C. 2002)) ("[A]cceptance by the federal government of land in trust for an Indian tribe thereby confers jurisdiction on the tribe.") Contrary to Plaintiffs' contentions, transfer of jurisdiction from a State to the Federal Government and an Indian tribe does not require consent by a state. *See Nevada v. Hicks*, 533 U.S. 353, 365 (2001) ("The States' inherent jurisdiction on reservations can of course be stripped by Congress."); *City of Roseville*, 219 F.Supp.2d at 130.[5] For instance, Section 5108 explains that any lands acquired pursuant to the IRA are "exempt from State and local taxation." 25 U.S.C. § 5108. In other words, the state is without jurisdiction to tax those lands "absent cession of jurisdiction or other federal statute permitting it." *See Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973). State jurisdiction over land held by the United States on behalf of an Indian tribe is curtailed in other ways as well. *E.g.* 25 U.S.C. § 2701(5) ("Indian tribes have the exclusive right to regulate gaming activity on Indian lands…."); 18 U.S.C. § 1166(d) ("The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws … unless [the] Indian tribe … has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe."); 25 C.F.R. § 1.4 (Except as authorized by the Secretary, "none of the

---

[5] Consent by a state is only required when the United States takes "exclusive jurisdiction over land." *Upstate Citizens for Equality Inc. v. United States*, 841 F.3d 556, 571 (2nd Cir. 2016) (quoting *Paul v. United States*, 371 U.S. 245, 263 (1963)); *United States v. Hollingsworth*, 783 F.3d 556, 563 (5th Cir. 2015).

laws … of any State … controlling the use or development of real or personal property, including water rights shall be applicable" to Indian land.); *Duro v. Reina*, 495 U.S. 676, 696 (1990) (Indian "tribes … possess their traditional and undisputed power to exclude persons whom they deem to be undesirable from tribal lands.") (citation omitted); *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 15 (1987) ("If state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law.") However, the Secretary's act of taking land into trust for an Indian tribe does not wholly divest the state of jurisdiction over the land. For instance, states retain authority to enforce some civil and criminal laws on Indian land. *See* 18 U.S.C. § 1162, 28 U.S.C. § 1360; *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251, 257-258 (1992) (citing *New York ex rel. Ray v. Martin*, 326 U.S. 496 (1946)).

When the Secretary takes land into trust for an Indian tribe, some but not all jurisdiction is transferred from the State to the Indian tribe and the Federal Government. The fee-to-trust determination does not result in the Federal Government or an Indian tribe holding exclusive jurisdiction over the land.[6] However, IGRA does not require a tribe to exercise exclusive jurisdiction over land.[7] The Court does not now attempt to articulate the full scope of an Indian tribe's jurisdiction over land held in trust for it by the Federal Government.[8] The Court also does

---

[6] Again, such a complete divestment *would* require a state to consent. *Upstate Citizens for Equality*, 841 F.3d at 571 (citing *Paul v. United States*, 371 U.S. 245, 263-265 (1963)) (explaining that consent by a state to acquisition of jurisdiction by the federal government is only necessary where the federal government acquires "exclusive" jurisdiction over the land).

[7] Albeit in a different context, Congress used the phrase "exclusive jurisdiction" in one subsection of § 2710. *Cf.* 25 U.S.C. § 2710(a)(1) ("Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes….") If Congress had intended to require an Indian tribe to hold *exclusive* jurisdiction over land to the exclusion of a state, it would have so indicated. No tribe in California has exclusive jurisdiction over their land. *E.g.* 18 U.S.C. 1162(a) (providing that the State of California "shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country" in California); *United States v. E.C. Invs.*, 77 F.3d 327, 330 (9th Cir. 1996). Class III gaming is regularly conducted on lands over which Indian tribes lack exclusive jurisdiction. *See* List of Ratified Tribal-State Gaming Compacts, www.cgca.ca.gov/?pageID=compacts (last accessed Nov. 28, 2017) (In California "[t]here are currently 62 casinos operated by 60 tribes.")

[8] Indeed, many courts have noted the difficulty of such an endeavor. *See, e.g.*, *Nevada v. Hicks*, 533 U.S. at 376 (Souter, J. concurring) ("Tribal adjudicatory jurisdiction over non-members is … ill-defined … since th[e] [Supreme Court's] own pronouncement s on the issue have pointed in seemingly opposite directions."); *Philip Morris USA v. King Mountain tobacco Co., Inc.*, 569 F.3d 932, 934 (9th Cir. 2009); *Murphy v. Warden*, ---F.3d ----, 2017 WL 5181761, *12 (10th Cir. 2017); *See also*, Barnard, Responding to Public Health Emergencies on Tribal Lands: Jurisdictional and Practical Solutions, 15 Yale J. Health Pol'y, L& Ethics 251 (2015).

not now attempt to set out the minimum requirements for a finding under IGRA that an Indian tribe exercises jurisdiction over land. The Court merely concludes that, when the Secretary of the Interior takes land into trust for an Indian tribe, that Indian tribe certainly has jurisdiction over that land for purposes of IGRA.

No review of the history of the land is required to determine whether North Fork exercises jurisdiction over the Madera Site. That basis for supplementation of the record is rejected.

D. Governmental Power Over Indian Land

The Court must next ask whether the supplementation material is relevant for determining whether North Fork exercises sufficient "governmental power" over the Madera Site. *See* 25 U.S.C. § 2703(4). "The term is undefined in IGRA and 'the case law considering this phrase is sparse.'" *Commonwealth v. Wampanoag Tribe of Gay Head*, 144 F.Supp.3d 152, 166 (D. Mass. 2015) (quoting *Miami Tribe of Okla. v. United States*, 5 F.Supp.2d 1213, 1217 (D. Kan. 1998)); *accord Kansas v. United States*, 249 F.3d 1213, 1228 (10th Cir. 2001).

What is clear from case authority is that exercise of governmental power requires more than a tribe's "theoretical authority"; it requires "the presence of concrete manifestations of … authority." *Massachusetts v. Wampanoag Tribe of Gay Head*, 853 F.3d 618, 625 (1st Cir. 2017); *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 703 (1st Cir. 1994).

All of the documents with which Plaintiffs seek to supplement the record relate to events that predate or happened concurrently with the Secretary's fee-to-trust determination. Prior to the fee-to-trust acquisition of the Madera Site, North Fork could not have exercised governmental authority over the land. Plaintiffs recognize as much. Doc. 32 at 2 ("Absent jurisdiction, the exercise of governmental power is, at best ineffective, and at worst, invasion." (citation omitted)) Plaintiffs have presented no argument to suggest that any of the proposed supplementation materials weigh on whether North Fork exercised governmental power of the Madera Site when the Secretary set conditions under which North Fork could conduct gaming. For that reason, insofar as Plaintiffs moves to supplement the record to show that the Secretary failed to consider evidence relevant to

North Fork's exercise of governmental power over the Madera Site, that motion will be denied.

**V. Order**

Based on the foregoing, Plaintiff's motion to supplement the administrative record is DENIED.

IT IS SO ORDERED.

Dated:   November 29, 2017

_____
SENIOR DISTRICT JUDGE