UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLUB ONE CASINO, INC., dba CLUB ONE CASINO; GLCR, INC., dba THE DEUCE LOUNGE AND CASINO,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; RYAN ZINKE, in his official capacity as Secretary of the Interior; and MIKE BLACK in his official capacity as Acting Assistant Secretary of the Interior – Indian Affairs,<br><br>Defendants. | **CASE NO. 1:16-cv-01908-AWI-EPG**<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** (Doc. 36)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** (Doc. 37)<br><br>**ORDER CLOSING THE CASE** |

## I. Introduction

Plaintiffs Club One Casino and The Deuce Lounge (collectively "Plaintiffs" or "Club One") bring the instant Administrative Procedures Act ("APA") challenge to the issuance of Secretarial Procedures by the United States Department of the Interior, the Secretary of the Interior, and the Assistant Secretary for Indian Affairs (collectively "DOI" or "Federal Defendants") permitting the North Fork Rancheria of Mono Indians ("North Fork") to conduct tribal gaming on a 305.49 acre parcel of land in Madera County, California (the "Madera Site"). Complaint, Doc. 1 ("Compl.") at ¶ 1. The substance of the APA challenge is directed at whether

the Federal Defendants adequately considered whether North Fork had jurisdiction over the Madera Site for purposes of the Indian Gaming Regulatory Act ("IGRA"), 29 U.S.C. § 2701, et seq.

The parties have filed cross motions for summary judgment. Plaintiffs' argument is twofold. First they contend that "the Secretarial Procedures [offend the APA] because defendants … never considered … whether the North Fork Tribe actually possesses territorial jurisdiction over the proposed casino site." Doc. 36-1 at 12. The Federal Defendants respond that North Fork necessarily has jurisdiction over the proposed gaming site as a result of the fee-to-trust determination conducted pursuant to the Indian Reorganization Act ("IRA"), taking that land into trust for the Tribe. Second, Plaintiffs argue, assuming that the fee-to-trust determination does shift some jurisdiction from the state to the Tribe, the IRA violates of the Tenth Amendment.

For the following reasons, Plaintiffs' motion will be denied and the Federal Defendants' motion will be granted.

## II. Background

Although the background surrounding the proposed gaming facility at the Madera Site is extensive, the Court limits this section to the information relevant to, or addressed in, Plaintiffs' challenge to the Secretary's issuance of Secretarial Procedures.

A. Plaintiffs – Club One Casino and The Deuce Lounge

Club One Casino and The Deuce Lounge are both cardrooms licensed by the State of California. Declaration of Kyle Kirkland, Doc. 36-3 ("Kirkland Decl.") at ¶¶ 2, 6. Club One operates in Fresno, California and is licensed by the City of Fresno. *Id* at ¶ 2. The Deuce Lounge is located in Goshen, California and licensed by the County of Tulare. *Id*. at ¶ 6. Both Club One and The Deuce Lounge are limited in the kinds of games that they may offer. For instance, both operate poker, baccarat, and blackjack games but neither is permitted to operate slot machines or banking card games where the player bets against the house. *Id*. at ¶¶ 2, 6.

The Madera Site is roughly 25 miles from Club One and 65 miles from The Deuce Lounge. Kirkland Decl. at ¶¶ 3, 7. The Secretarial Procedures permit North Fork to operate slot

2

machines and banking card games that Plaintiffs cannot operate. *See* Administrative Record ("AR") at AR00002202 (North Fork is permitted under the Secretarial Procedures to operate "Gaming Devices," i.e., slot machines, and "banking or percentage card games," among other things.) Both Club One and The Deuce Lounge contend that their businesses will suffer if North Fork is permitted to conduct Class III gaming at the Madera Site. Kirkland Decl. at ¶¶ 5, 9.

B. The North Fork Rancheria of Mono Indians

The North Fork is a federally recognized Indian tribe. AR00000241; *see generally Stand Up for California! v. United States Department of the Interior*, 204 F.Supp.3d 212, 228-231 (D.D.C. Sept. 6, 2016) *aff'd* 879 F.3d 1177 (D.C. Cir. Jan. 12, 2018) *rehrg. en bank denied* (Apr. 10, 2018).[1] "In 1916, pursuant to appropriations acts authorizing the Secretary to purchase land in California for Indians, *see* Act of May 18, 1916, ch. 125, § 3, 39 Stat. 62, … the DOI purchased what became the North Fork Rancheria, comprised of 80 acres of land near the town of North Fork, for the use and benefit of approximately 200 landless Indians belonging to the North Fork band." *Stand Up for California!*, 204 F.Supp.3d at 229. That 80-acre plot of land is approximately 4 miles east of the town of North Fork in Madera County. AR 00000245. "The land, which was 'poorly located [,] ... absolutely worthless as a place to build homes on' and 'lack[ed] ... water for [both] domestic purposes and ... irrigation,' was essentially uninhabitable." *Stand Up for California!*, 204 F.Supp.3d at 229 (citing a 1920 survey of landless nonreservation Indians in California). Additionally, that reservation was "'on environmentally sensitive lands within the Sierra National Forest, … near Yosemite National Park….'" *Id.* at 231 (citing the Bureau of Indian Affairs, Record of Decision, finding that the Madera Site should be gaming-eligible pursuant to 25 U.S.C. § 2719(b)(1) (Sept. 1, 2011)).

The United States also holds in trust for the Tribe a 61.5-acre tract of land "'located on a

---

[1] The administrative record contains many of the orders issued in actions related to the proposed Class III gaming at the Madera Site. *See, e.g.*, AR00000456-00000498, 00001348-00001363, 00001366-00001388, 00001542-00001552. To name a few, the record contains court orders from *Stand Up For California! v. State of California*, Madera Superior Court Case No. MCV062850 (June 26, 2014), *North Fork Rancheria of Mono Indians v. California*, Case No. 15-cv-419-AWI-SAB, 2015 WL 11438206 (E.D. Cal. Nov. 13, 2015), and *Stand Up For California! v. United States Department of the Interior*, Case No. 12-cv-2039-BAH, 204 F.Supp.3d 212 (D. D.C. 2016). For the sake of clarity and accessibility, the Court uses the reporter citations for those cases rather than citing to their location in the administrative record in this Court's CM/ECF system.

steep hillside ... in … North Fork.'" *Stand Up for California!*, 204 F.Supp.3d at 231. (citation omitted). "The tract contains a community center, basic infrastructure (i.e., roads, water, sewer), pads for nine single-family homes, and the North Fork Tribe's 'current government headquarters.'" *Id.* (citation omitted).

C. The Madera Site Acquisition

The Madera Site is a 305.49-acre plot of land in Madera County, California, approximately 15 miles north of the city limits of the City of Fresno on Avenue 17, just west of the intersection with State Route 99. AR00002299-00002300; Doc. 37-2 at 3. The Madera Site is about 38 miles from North Fork's Rancheria lands and about 36 miles from its 61.5 acre tract which is used for housing. AR00000245; *Stand Up for California*, 204 F.Supp.3d at 231; Doc. 37-2 at 3.

In March of 2005, North Fork submitted an application to the Bureau of Indian Affairs ("BIA") to have the Madera Site taken into trust for the purpose of operating a Class III gaming facility ("fee-to-trust application"). Doc. 37-2 at 5; AR00000240. In the same month, North Fork also requested that the Secretary make the two-part after-acquired lands determination[2] pursuant to 25 U.S.C. § 2719(b)(1)(A) ("2719 application"). Doc. 37-2 at 5; AR00000240; AR 00000160. On September 1, 2011, the Secretary issued a Record of Decision on the 2719 application ("the 2719 ROD"), finding that gaming on the Madera Site would be in the best interest of North Fork and not detrimental to the surrounding community. Doc. 37-2 at 6; AR00000240. The Governor of the State of California ("the Governor") concurred with that determination on August 31, 2012. Doc. 32-7 at 7; AR 00000317-00000318.

On November 26, 2012, the Assistant Secretary—Indian Affairs issued a Record of Decision approving the fee-to-trust application ("the IRA ROD"). Doc. 37-2 at 7; AR00000159-00000227. The Madera Site was acquired in trust by the United States for the benefit of North Fork in 2013. *North Fork Rancheria of Mono Indians of California v. State of California*, 2015 WL 11438206, *2 (E.D. Cal. Nov. 13, 2015) ("*North Fork v. California*"); Doc. 37-2 at 3. Prior

---

[2] That determination sought is regularly referred to as the "two-part" determination. *E.g., Cachil Dehe Band of Wintun Indians of Colusa Indian Community v. Zinke*, ---F.3d----, 2018 WL 2033762, *3 (9th Cir. May 2, 2018).

to the acquisition of the Madera Site in trust for North Fork, the land was privately owned. Doc. 37-2 at 4; Doc. 30 at 3. Jurisdiction over the land was not reserved by the United States when California was admitted to the Union in 1850. Doc. 37-2 at 4. The State of California has never taken express steps to cede territorial jurisdiction over the land to the United States or North Fork and the United States has never issued a written acceptance of cession of jurisdiction in connection with the Madera Site. Doc. 37-2 at 4.

D. Tribal-State Compact Negotiation History

On August 31, 2012, the Governor concluded a compact with North Fork to conduct Class III gaming at the Madera Site. Doc. 37-2 at 7; AR00000320-00000438. That compact was concluded on the same date as the Governor's concurrence with the Secretary's two-part determination and before the IRA ROD issued or the land was taken into trust for North Fork. The Governor's office then forwarded the compact to the California Legislature for ratification. Doc. 37-2 at 7; *North Fork v. California*, 2015 WL 11438206 at *2. On June 27, 2013, the California Legislature ratified the compact by means of Assembly Bill 277 ("AB 277"), and the Governor signed the bill on July 3, 2013. Doc. 37-2 at 8. The California Secretary of State forwarded the compact to the Secretary of the Interior on July 16, 2013, with the notation that the effective date of the compact would be January 1, 2014, unless a referendum measure qualified for the ballot. AR00000439-00000440.[3] The Secretary of State made clear that if the referendum measure qualified for the ballot, AR 277 would not take effect until the voters had voted on it.

Notice of the completed compact was published in the Federal Register on October 22, 2013, stating that the compact was "approved" and was taking effect to "the extent it was consistent with IGRA." 78 Fed.Reg. 62649-01 (Oct. 22, 2013). On November 20, 2013, the Secretary of State informed the Secretary of the Interior that a veto referendum on AR 277 qualified for the ballot ("Proposition 48") and that the measure would go before voters at the November 3, 2014 general election. AR00000455. Sixty one percent of California voters voted

---

[3] The Governor's office sent a separate letter on July 9, 2013, indicating that the State of California had entered into a compact with North Fork. AR00000441.

against the legislative ratification of the compact. Doc. 37-2 at 8.[4]

On January 2, 2015, North Fork requested that the State of California enter into negotiations for a new compact for Class III gaming on the Madera Site. Doc. 37-2 at 8-9; *North Fork v. California*, 2015 WL 11438206 at *7. The State refused, indicating that negotiations for a compact regarding gaming at the Madera Site would be "futile" given the result of the referendum. *Id.*

E. The Good Faith Litigation, the Remedial Process, and Issuance of Secretarial Procedures

On March 17, 2015, North Fork filed suit against California pursuant to 25 U.S.C. § 2710(d)(7), seeking a determination that the State of California did not negotiate in good faith toward an enforceable compact. Doc. 37-2 at 9; *see generally North Fork v. California*, 2015 WL 11438206. On November 13, 2015, the Court held that by refusing to negotiate, California failed to negotiate in good faith to conclude a Tribal-State compact within the meaning of 25 U.S.C. § 2710(d)(7)(B)(ii-iii). *Id.* at *8. On that basis, the Court ordered North Fork and California to conclude a compact within 60 days of the date of that order. *Id.* at *8, 12 (citing 25 U.S.C. § 2710(d)(7)(B)(iii)).

North Fork and California did not conclude a compact within the 60-day period allowed. Doc. 37-2 at 9. On January 25, 2016, the Court appointed a mediator and directed North Fork and California to submit their last best offers. Doc. 37-2 at 9; *see* 25 U.S.C. § 2710(d)(7)(B)(iv). The mediator was directed to select from the two proposed compacts the one which best comported with IGRA, other Federal law, and the findings and order of the Court. Doc. 37-2 at 9; s*ee* 25 U.S.C. § 2710(d)(7)(B)(vii). On February 11, 2016, the mediator determined that the proposed compact submitted by North Fork best met the Court's direction. Doc.37-2 at 9; AR00000002-AR00000003. From the date that the mediator returned the selected compact to the California, California was permitted to sixty days to consent to the selected compact or decline to do so. 25 U.S.C. § 2710(d)(7)(B)(vi). California did not consent to the compact within the time permitted. Doc. 37-2 at 10; AR00000001. In conformity with the requirements of IGRA and the

---

[4] *See* Index of California Referenda located at http://www.sos.ca.gov/elections/ballot-measures/referendum/ (last accessed on July 11, 2018).

order of the Court, the mediator forwarded the selected compact to the Secretary of the Interior to prescribe procedures under which North Fork could conduct Class III gaming at the Madera Site. Doc. 37-2 at 10; AR00000001; *see* 25 U.S.C. 2710(d)(7)(B)(vii).

On July 29, 2016, the Secretary issued Secretarial Procedures permitting the Tribe to conduct Class III gaming without a Tribal-State compact. AR00002186-00002325. In issuing those procedures, the Secretary did not make any express finding regarding whether North Fork had jurisdiction over the Madera Site or whether it was Indian land. Doc. 37-2 at 10; AR00002186-00002325.

The administrative record contains no evidence that any governmental entity had affirmatively concluded that North Fork had territorial jurisdiction over the Madera Site. Doc. 37-2 at 10-11. However, in resolving the cross-motions for judgment on the pleadings in *North Fork v. California*, 2015 WL 11438206 at *8, the Court explained that it was "undisputed" between North Fork and California that "the Madera [Site] [is] gaming-eligible Indian land[] within the meaning of 25 U.S.C. §§ 2703(4) and 2719(b)(1)(A)." *See also North Fork v. California*, 2016 WL 4208452, *5 (E.D. Cal. Aug. 16, 2016) (subsequent determination) (The Court emphasized that the State of California admitted that North Fork "exercises jurisdiction over the Madera Parcel, which constitutes 'Indian lands' under IGRA.") [5]

F. North Fork Tribal Council Action With Respect to the Madera Site[6]

On October 16, 2015, the North Fork Tribal Council passed Resolution No. 15-58 approving a general policy for permitting of Indian agricultural lands and a conservation plan for the Madera Site. Declaration of Steven Miskinis, Doc. 37-3 ("Miskinis Decl.") at 1-6.

G. This Court's Decision Denying Supplementation of the Administrative Record

Club One filed a motion, seeking to supplement the administrative record compiled by the Secretary. Doc. 22. Club One argued that consideration of the ownership history of the Madera Site is relevant to whether North Fork had jurisdiction over that land. *Id*. at 5-6, 8-10.

---

[5] No order in that action expressly considered whether there could be Indian lands over which a tribe did not have jurisdiction.

[6] Plaintiffs object to consideration of this evidence on the bases that it is irrelevant and falls outside of the administrative record.

1 Therefore, Club One argued, supplementation of the record was necessary to determine whether

2 the Secretary had considered all factors relevant to the prescribing of Secretarial Procedures for

3 Class III gaming. *Id*. at 5.

4      In order to determine whether to permit supplementation of the administrative record, it

5 was "necessary [for the Court] to determine" what it means for "an Indian tribe [to] exercise

6 jurisdiction over land" for purposes of IGRA. Doc. 33 at 6.[7] To that end, the Court permitted the

7 parties to submit supplemental briefing on that issue. Doc. 30 at 8.  Mirroring their present

8 positions, Club One argued that a State must cede jurisdiction over land to a tribe or the United

9 States in order for a tribe to have jurisdiction over that land for purposes of IGRA; whereas, the

10 Secretary argued that jurisdiction over land, for purposes of IGRA, is conferred to a tribe when

11 the land is taken into trust by the United States for the benefit of that tribe.

12      The Court made the following limited determination:

13      When the Secretary takes land into trust for an Indian tribe, some but not all
14      jurisdiction is transferred from the State to the Indian tribe and the Federal
         Government. The fee-to-trust determination does not result in the Federal
15      Government or an Indian tribe holding exclusive jurisdiction over the land.[fn]
         However, IGRA does not require a tribe to exercise exclusive jurisdiction over
16      land.[fn]…. [W]hen the Secretary … takes land into trust for an Indian tribe, that
         Indian tribe certainly has jurisdiction over that land for purposes of IGRA.
17

18 Doc. 33 at 9-10. Because the parties were (and are) in agreement that the Madera Site was held

19 in trust by the United States for North Fork at the time the Secretary prescribed gaming

20 procedures (and Club One is not challenging the fee-to-trust determination), the Court found that

21 the material relating to the ownership history of the Madera Site was irrelevant to the Secretarial

22 determination in question here—the prescribing of gaming procedures.

23                                    **III. Legal Standard**

24      Summary judgment is an appropriate mechanism for reviewing agency decisions under

25 the APA. *Turtle Island Restoration Network v. United States Dept. of Commerce,* 878 F.3d 727,

26 732 (9th Cir. 2017); *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th

27

28 [7] In prior orders the Court has interchangeably referred to "having" and "exercising" jurisdiction over land. Because
it now addresses "having jurisdiction" for purposes of § 2710(d)(3)(A), (d)(7)(B)(vii) and "exercising governmental
power" for purposes of 2703(4), the Court ceases the former imprecision.

Cir.1997); *Occidental Engineering Co. v. Immigration & Naturalization Service*, 753 F.2d 766, 769–70 (9th Cir.1985). However, courts do not utilize the standard analysis for determining whether a genuine issue of material fact exists. *See Occidental*, 753 F.2d at 769–70; *Academy of Our Lady of Peace v. City of San Diego*, 835 F.Supp.2d 895, 902 (S.D. Cal. 2011); *California RSA No. 4 v. Madera Cnty.*, 332 F.Supp.2d 1291, 1301 (E.D. Cal. 2003). A court "is not required to resolve any facts in a review of an administrative proceeding." *Occidental*, 753 F.2d at 769; *California RSA*, 332 F.Supp.2d at 1301. Instead, in reviewing an agency action, the relevant legal question for a court reviewing a factual determination is "whether the agency could reasonably have found the facts as it did." *San Francisco*, 130 F.3d at 877; *Occidental*, 753 F.2d at 769.

The Court's review in resolving an APA challenge to an agency action is circumscribed: the court will only set aside agency action if its "'findings[] and conclusions [are] found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 'in excess of statutory jurisdiction' or 'without observance of procedure required by law." *Turtle Island*, 878 F.3d at 732 (quoting 5 U.S.C. § 706(2)(A), (C)-(D)). Agency action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Defs. Of Wildlife v. Zinke*, 856 F.3d 1248, 1256-1257 (9th Cir. 2017) (citation omitted); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (An "agency must examine the relevant data and articulate a satisfactory explanation for its action.") This standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)). Review under this standard is narrow, and the court may not substitute its judgment for that of the agency. *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 573 (9th Cir. 1988). Nevertheless, the court must "engage in a substantial inquiry ... a

thorough, probing, in-depth review." *Native Ecosys. Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citation and internal quotations omitted).

Assuming an error was made, the Court considers whether it was harmless. 5 U.S.C. § 706. In the context of agency review, the role of harmless error is constrained. The doctrine may be employed only "when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *Buschmann v. Schweiker*, 676 F.2d 352, 358 (9th Cir.1982).

## IV. Discussion

Plaintiffs' motion indicates that it presents two issues: (1) whether the Secretary violated IGRA when he issued Secretarial Procedures "authorizing North Fork … to operate a casino on off-reservation land that is still under state jurisdiction?";[8] and (2) "[d]oes it violate the Tenth Amendment if the Federal Government unilaterally diminishes a state's territorial jurisdiction and shifts it to an Indian tribe?" Doc. 36-1 at 10. Plaintiffs present a third argument: (3) the Secretarial Procedures "are not consistent with state law" because no compact is in effect and they therefore violate IGRA. Doc. 36-1 at 47.

The Court will resolve the first issue: No, because the land was taken into trust by the United States for North Fork, North Fork had jurisdiction over that land for purposes of IGRA and therefore IGRA was not violated by Secretary prescribing Secretarial Procedures.

Next, the Court will not resolve the second issue because the agency action that purportedly violates the Tenth Amendment—the fee-to-trust determination made pursuant to the IRA—is not challenged in this action therefore the question is not properly before the Court. Insofar as Plaintiffs seek to vindicate the State of California's partial divestment of jurisdiction by operation of the IRA, it is well settled in this Circuit that they lack standing to do so. *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 972 (9th Cir. 2009) (citing *Tenn. Elec. Power Co. v. Tenn Valley Auth*, 306 U.S. 118, 144 (1939); *Stop The Casino 101 Coalition v. Salazar,* 384 Fed.Appx. 546, 548 (9th Cir. 2010); *see City of Roseville v. Norton*, 219 F.Supp.2d 130, 146-148

---

[8] Plaintiffs also dispute whether North Fork exercised governmental power over the Madera Site such that it is appropriately considered "Indian land." *See* 25 U.S.C. § 2703(4)(B); 25 C.F.R. § 502.12(b). The Court will address that argument as well.

(D.D.C. 2002).

Finally, the court will resolve the third issue: Secretarial Procedures are not inconsistent with California law merely because a compact does not exist.

A. IGRA—Jurisdiction Over Land and Governmental Power Requirements

In the final stage of the IGRA remedial process, the Secretary must prescribe gaming procedures under which Class III gaming may be conducted "on the Indian lands over which the Indian tribe has jurisdiction." 25 U.S.C. § 2710(d)(7)(B)(vii)(II); *see also* 25 U.S.C. 2710(d)(3)(A). Courts, including this Court, have read that section as imposing two requirements.[9] *See Massachusetts v. Wampanoag Tribe of Gay Head*, 853 F.3d 618, 624 (1st Cir. 2017) *cert. denied*, 138 S.Ct. 639. The first requirement is that an Indian tribe "have jurisdiction" over the gaming site. *Wampanoag Tribe*, 853 F.3d at 624; *Upstate Citizens for Equality, Inc. v. United States*, 841 F.3d 556, 566 (2nd Cir. 2016) *cert. denied*, 2017 WL 5660979 (Nov. 27, 2017) (quoting *Citizens Against Casino Gambling in Erie County v. Chaudhuri*, 802 F.3d 267, 279 (2nd Cir. 2015)); *Miami Tribe of Oklahoma v. United States*, 656 F.3d 1129, 1144 (10th Cir. 2011); *Club One Casino, Inc. v. United States Dept. of Interior*, 2017 WL 5877033, *4 (E.D. Cal. Nov. 29, 2017). In its last order, the Court expressly declined to set out the precise contours of what it means for an Indian tribe to "have jurisdiction" over a particular piece of land. *Club One*, 2017 WL 5877033 at *6.

The second requirement, arising from the definition of "Indian land," is that the tribe "exercise governmental power" over the land. 25 U.S.C. § 2703(4)(B); *see Wampanoag Tribe*, 853 F.3d at 624-626 (citing, *inter alia*, *State of R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 702 (1st Cir. 1994)); *Chaudhuri*, 802 F.3d at 286.

---

[9] The Court would note that the language of § 2710(d)(7)(B)(vii)(II) could be just as easily read to require *three* showings as two: (1) Indian lands, over which (2) the Indian tribe (3) exercises jurisdiction. Indeed, in the context of § 2710(d)(3)(A), courts have found those three prerequisites. *See Mechoopda Indian Tribe of Chico Rancheria v. Schwarzenegger*, 2004 WL 1103021, *5 (E.D. Cal. Mar. 12, 2004) (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Engler*, 304 F.3d 616 (6th Cir. 2002) However, the Ninth Circuit made clear that challenges to a tribe's status as an Indian tribe is a collateral attack, not appropriately raised in the IGRA context. *See Big Lagoon Rancheria v. California*, 789 F.3d 947, 953-954 (9th Cir. 2015) (en banc) (Asserting that a tribe lacks "standing to invoke … IGRA,"—in that situation, whether or not the tribe is an Indian tribe, *see* § 2710(d)(3)(A)— "necessarily argues that the [Bureau of Indian Affairs] exceeded its authority when it took" land into trust for the tribe pursuant to the IRA. "The proper vehicle to make such a challenge is a petition to review [the IRA entrustment decision] pursuant to the APA.")

In short, an Indian tribe must exercise governmental power over land held in trust by the United States for the tribe for the land to be Indian land. 25 U.S.C. § 2703(4)(B). In order to conduct gaming on that Indian land (or demand that a state negotiate toward an enforceable compact), the Indian tribe conducting that gaming must be the tribe that has jurisdiction over that land.[10]

B. Having Jurisdiction Over Indian Land

Plaintiffs begin their argument by quoting the portion of this Court's November 29, 2017 order that framed the issue then before the Court: "Legally, the parties are in agreement that, at least in the ordinary case, acquisition of an ownership interest in land by the United States only impacts title to that land; it does not divest the State of jurisdiction over that land. [citation omitted] … The parties disagree regarding the jurisdictional impact of the Secretary taking the Madera Site into trust for North Fork through the authority delegated to the Secretary by the IRA." Doc. 36-1 at 10 (quoting Doc. 33 at 5). It is not until much later in Plaintiffs' argument that they recognize that the Court resolved that question in its November 29, 2017 order. *See* Doc. 36-1 at 44. In the interim, Plaintiffs' argument reiterates (albeit in more depth) the argument submitted in response to this Court's authorization for supplemental briefing in resolving Plaintiffs' motion to supplement the administrative record. *Compare* Doc. 32 *with* Doc. 36-1.

In both iterations of Plaintiffs' argument, the reasoning is as follows: IGRA requires "territorial jurisdiction" over any land where Class III gaming is to be conducted; California has territorial jurisdiction over all land within its borders, including the Madera Site; transfer of title to real property does not impact territorial jurisdiction over that real property; in order for an Indian tribe to acquire jurisdiction over land sufficient for purposes of IGRA, the State in which the land lies must expressly cede jurisdiction to the tribe or the United States; no express cession of jurisdiction

---

[10] The Secretary challenges whether he must independently verify that those requirements are met prior to issuing secretarial procedures in light of the fact that those same requirements were necessary in order for North Fork to initiate its good faith negotiation litigation against the State to begin with. *Compare* 25 U.S.C. § 2710(d)(3)(A) *with* 25 U.S.C. § 2710(d)(7)(B)(vii)(II). This Court shares the Secretary's doubts regarding whether the Secretary is required by § 2710(d)(7)(B)(vii)(II) to verify that the same requirements for a tribe to institute a good faith negotiation action have been met. Although the Secretary's position offers the appeal of eliminating the risk of inconsistent findings that IGRA does not appear to anticipate, because the Court finds that both the "having jurisdiction" and "exercising governmental power" requirements are met, the court does not resolve that question.

by California has taken place with respect to the Madera Site and the United States has not expressly accepted jurisdiction of the Madera Site; therefore North Fork does not have jurisdiction over the Madera Site and the Secretary erred in issuing Secretarial Procedures.

To Plaintiffs' motion to supplement and motion for summary judgment, the Secretary has responded that North Fork's jurisdiction over the Madera Site, for purposes of IGRA, arose through the act of placing the land in trust for the tribe. The Court agreed with the Secretary's position in denying Plaintiffs' motion to supplement the administrative record and the Court remains in agreement now.

i. *The fee-to-trust determination shifts some jurisdiction from a State to an Indian tribe.*

As a starting point, Congress has the power to regulate commerce with the Indian tribes. U.S. Const. art. I, § 8, cl. 3 (conferring upon Congress the power "[t]o regulate commerce ... with the Indian tribes.") The Supreme Court has described Congressional authority under the Indian Commerce Clause as "plenary." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989); *Morton v. Mancari*, 417 U.S. 535, 551 (1974) (noting that Congress has plenary power "to deal with the special problems of Indians," including the power to legislate); *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998). The IRA was enacted, at least in part, pursuant to that authority. *See Upstate Citizens*, 841 F.3d at 568; *South Dakota v. United States Department of the Interior*, 787 F.Supp.2d 981, 992 (D. S.D. 2011).

The United States Supreme Court has been clear that § 5 of the IRA "provides the proper avenue for" an Indian tribe "to reestablish sovereign authority over territory…." *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 221 (2005) (citing 25 U.S.C. § 465, now codified at 25 U.S.C. § 5108); *see Carcieri v. Kempthore*, 497 F.3d 15, 36 (1st Cir. 2007) *rev'd on other grounds* 555 U.S. 379 (Regardless of how an Indian tribe lost "aboriginal title or ancient sovereignty" over land—even if it is fully extinguished—§ 5 is appropriate to "establish[] tribal sovereignty over land."); *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 531 n.6 (1998) (suggesting that action by Congress or an executive agency acting under delegated authority can create or recognize Indian rights with respect to property). However, the Supreme Court did not detail the precise ways that taking land into trust

13

for an Indian tribe impact the share of jurisdiction between an Indian tribe, a State, and the Federal Government. *See Sherrill*, 544 U.S. at 220-221 (The implementing regulations for § 5 of the IRA are "sensitive to the complex interjurisdictional concerns that arise when a tribe seeks to regain sovereign control over territory.") The Ninth Circuit has indicated that § 5 of the IRA is designed to allow the Secretary hold such lands "in the legal manner and condition in which trust lands were held under the … court decisions [existing before enactment of the IRA, i.e.,] free of state regulation."[11] *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 666 (9th Cir. 1975); *see Chaudhuri*, 802 F.3d at 285-286; *Cf. Guidville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 777 (9th Cir. 2008) (The DOI gives state governments an opportunity to object to the fee-to-trust determination by demonstrating "why taking the land into trust would 'impact [] their jurisdiction….'") (citing, *inter alia*, 25 C.F.R. § 151.11(d)). Under Ninth Circuit authority, this Court should treat land placed in trust for a tribe pursuant to § 5 of the IRA in the same manner as land held in trust for tribes prior to enactment of the IRA in 1934. *Santa Rosa*, 532 F.2d at 666; *see also Rice v. Olson*, 324 U.S. 786, 789 (1945) ("The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.") "Rather than reading the omission of a provision exempting the lands [taken into trust pursuant to § 5 of the IRA] from state regulation as evidencing a congressional intent to allow state regulation, [the Ninth Circuit] read the omission as indicating that Congress simply took it for granted that the states were without such power, and that an express provision was unnecessary; i.e., that the exemption was implicit in the grant of trust lands under existing legal principals." *Santa Rosa*, 532 F.2d at 666 n. 17.

Other circuits share a similar understanding. The Second Circuit held in *Upstate Citizens*, 841 F.3d at 569, that "[w]hen the federal government takes land into trust for an Indian tribe, the state that previously exercised jurisdiction over the land cedes some of its authority to the federal and tribal governments." *Accord Chaudhuri*, 802 F.3d at 284 (finding in dicta that lands taken into trust pursuant to § 5 of the IRA are subject to tribal jurisdiction). *See also*, *Upstate Citizens*

---

[11] This Court does not read *Santa Rosa* for the proposition that Indian jurisdiction over land is entirely exclusive of state jurisdiction. *See* 18 U.S.C. § 1151.

*for Equality, Inc. v. United States*, ---S.Ct.----, 2017 WL 5660979, *1, 3 (Nov. 27, 2017)

(Thomas, J., dissenting from denial of cert.) (The Supreme Court's reading of the IRA in *Sherrill*

and the Second Circuit's reading of the IRA in *Upstate Citizens* permit the Secretary "to take any

state land and strip the State of almost all sovereign power over it 'for the purpose of providing

land for the Indians.'") The Court agrees with the Second Circuit that use of the fee-to-trust

provision of § 5 of the IRA shifts at least some jurisdiction from the State to a tribe and the

federal government.

       The cases cited by Plaintiffs do not undermine that conclusion.

    *ii.*    *The shift of jurisdiction to an Indian tribe resulting from a fee-to-trust determination is enough to satisfy the "having jurisdiction over" Indian lands requirement of § 2710(d)(1)(A)(i).*

       IGRA does not define what it means to have jurisdiction over Indian land.  The answers

that Courts have given to this question are varied. The Second Circuit has indicated that

"'[j]urisdiction,' in this context, means 'tribal jurisdiction'—'a combination of tribal and federal

jurisdiction over land,' to the exclusion (with some exceptions) of state jurisdiction." *Upstate

Citizens*, 841 F.3d at 566 (quoting *Chaudhuri*, 802 F.3d at 279-280)); *see Mechoopda Indian

Tribe of Chico Rancheria v. Schwarzenegger*, 2014 WL 1103021, *7 (E.D. Cal. 2004). The

Second Circuit also explained that lands over which tribal jurisdiction exist "have historically

been referred to as 'Indian country.'" *Chaudhuri*, 802 F.3d at 280; *see* 18 U.S.C. § 1151; *accord

HRI, Inc. v. EPA*, 198 F.3d 1224, 1250 (10th Cir. 2000) (quoting *Mustang Prod. Co. v. Harrison*,

94 F.3d 1382, 1384 (10th Cir. 1996) ("In order to determine whether the Tribes have [tribal]

jurisdiction [over a specific plot of land] we must … look to whether the land in question is

Indian country.")[12]

    "'[L]ands held in trust by the United States for the Tribes are Indian Country within the

meaning of § 1151(a).'" *U.S. v. Sohappy*, 770 F.2d 816, 822 (9th Cir. 1985) (quoting *Hydro

Resources, Inc v. EPA*, 608 F.3d 1131); *accord State of Ariz. V. EPA*, 151 F.3d 1205, 1214 (9th

---

[12] *See also Waterwheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 809 n.5 (indicating that Indian land can exist outside of a reservation and citing to a statute involving Indian country).

Cir. 1998); *HRI, Inc.* 198 F.3d at 1254; *Citizens Against Casino Gambling in Erie County v. Hogen*, 2008 WL 2746566 at *34 (collecting cases). For purposes of determining whether land is Indian country, the Supreme Court does not differentiate between lands taken into trust prior to statehood of the State in which the lands lie and those lands taken into trust after. *See U.S. v. John*, 437 U.S. 634, 649 (1978) (explaining that all doubt was removed that land was subject to federal criminal jurisdiction when it was declared to be held in trust for a tribe); *U.S. v. McGowan*, 302 U.S. 535, 537-538 (1938) (finding that land taken in trust by the United States for an Indian tribe after Nevada's induction into the union was Indian country because it was validly set apart for use of the Indians).

The First Circuit appears to require a lesser showing that the Second Circuit to prove that a tribe has jurisdiction over land for purposes of IGRA—that a tribe possesses "that portion of jurisdiction they possess by nature of their sovereign existence as a people." *Wampanoag Tribe*, 853 F.3d at 624. The First Circuit went on to suggest that a tribe's possession of any jurisdiction (and a state's possession of anything short of exclusive jurisdiction) meets the threshold showing. *Id*. at 625 n.5; *accord Narragansett,* 19 F.3d at 701.

In this Court's estimation, a logical reading of the "having jurisdiction over" language is simply that it is a linkage requirement between the Indian tribe and the Indian land at issue. In other words, that language is included to ensure that an Indian tribe in California, for instance, does not seek authorization to conduct Class III gaming on Indian land under the jurisdiction of some other tribe in New York. When a tribe possesses Indian lands, that tribe necessarily has jurisdiction over those lands. Such a reading is consistent with the language of § 2710(d)(3)(A):

> Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

25 U.S.C. § 2710(d)(3)(A). Congress uses linking language to explain that negotiation by a tribe must be with "the State in which [its Indian] lands are located," not some other State. In the same way, Congress explains that the tribe "having jurisdiction over the Indian lands upon which a

class III activity … is to be conducted" shall seek to negotiate with a State. That language is not to suggest some additional jurisdictional requirement but to link the specific tribe to specific Indian lands.[13]

Regardless of which standard is correct, North Fork has jurisdiction over the Madera Site. Applying the Second Circuit's test from *Upstate Citizens*, the land acquired in trust by the United States for the benefit of North Fork is Indian country, set apart for the use of the tribe and under federal superintendence. It is therefore under North Fork's tribal jurisdiction. *Sohappy*, 770 F.2d at 822; *Oklahoma Tax Comm'n*, 498 U.S. at 511. Applying the First Circuit's test from *Wampanoag Tribe*, the Madera Site is under North Fork's tribal jurisdiction because the fee-to-trust process shifted at least some jurisdiction to the tribe. *Santa Rosa*, 532 F.2d at 666 n. 17; *Chaudhuri*, 802 F.3d at 285. Finally, North Fork easily meets the linkage requirement that this Court would impose; North Fork is the Indian tribe for whom the United States holds the Madera Site.

C. Exercising Governmental Power

The term "exercising governmental power" is "undefined by IGRA and 'the case law considering the phrase is sparse." *Commonwealth v. Wampanoag Tribe of Gay Head*, 144 F.Supp.3d 152, 166 (D. Mass. 2015) (quoting *Miami Tribe of Okla. v. United States*, 5 F.Supp.2d 1213, 1217 (D. Kan. 1998)). Indeed, many circuit courts simply conclude that land is Indian land when it is held in trust by the United States for the benefit of a tribe without asking if a tribe exercises governmental power over that land. *Kansas ex rel. Schmidt v. Zinke*, 861 F.3d 1024, 1032 n.3 (10th Cir. 2017) *cert. denied* 138 S.Ct. 571 ("There is no question that the Kansas land constitutes 'Indian land' because the land was taken into trust for the Quapaw Tribe in 2012."); *Alabama v. PCI Gaming Authority*, 801 F.3d 1278, 1290-1293 (11th Cir. 2015) (concluding that lands are Indian lands after only finding that they were taken into trust for the tribe by the Secretary of the Interior); *see Big Lagoon Rancheria*, 789 F.3d at 953.[14] *See also Yankton Sioux*

---

[13] Other portions of IGRA suggest that any time Indian lands exist, *some* tribe has jurisdiction over those lands. *See* 25 U.S.C. § 2710(d)(1)(A)(i) (In order to conduct Class III gaming activities, those activities must be "authorized by an ordinance … that is adopted by the governing body of the Indian tribe having jurisdiction over such lands.")

[14] In an unpublished decision, the Ninth Circuit has suggested that *Big Lagoon Rancheria* stands for the proposition that a challenge to whether or not land is in fact Indian land can only be challenged by way of a challenge to the IRA

*Tribe v. Podhradsky*, 606 F.3d 994, 1006, 1010–11 (8th Cir.2010) (recognizing lands taken into trust by the BIA under § 5 of the IRA are Indian country, and "as a general rule Indian country falls under the primary civil, criminal, and regulatory jurisdiction of the federal government and the resident Tribe rather than the states") That understanding seems to match best with the Ninth Circuit and Supreme Court's most recent explanations of "Indian land" as defined by § 2703(4)(B). *Patchak v. Zinke*, --- U.S. ----, 138 S.Ct. 879, 903 n.1 (2018) ("Federal law allows Indian tribes to operate casinos on 'Indian lands,' 25 U.S.C. § 2710, which includes lands 'held in trust by the United States for the benefit of any Indian tribe,'" § 2703(4)(B)."); *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 554 n.2 (9th Cir. 2016) (Albeit in a slightly different context, the Ninth Circuit explained that "Section 2703(4) defines 'Indian lands' as 'all lands within the limits of any Indian reservation; and any lands title to which is ... held in trust by the United States for the benefit of any Indian tribe.'") Neither the Supreme Court nor the Ninth Circuit found the "exercise of governmental power" clause analytically significant enough to merit mention. On that basis, the Court holds that the Madera Site is Indian land because it is in trust for North Fork.

That said, the other circuit courts suggests a need for actual *use* of the jurisdictional authority over the land; some showing of "concrete manifestations of that authority." *Wampanoag Tribe*, 853 F.3d at 625 (quoting *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 703 (1st Cir. 1994)). In *Wampanoag Tribe*, the First Circuit explained that the tribe need not have achieved "full-fledged self-governance, but merely movement in that direction … to evince that the Tribe exercises … enough governmental power to satisfy" that requirement. 853 F.3d at 625-626. Any doubt in resolving whether a tribe exercises sufficient governmental power is "to be resolved in favor of Indians." *Id.* at 826 (quoting, *inter alia*, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586-587 (1977)).

The Second Circuit in *Wampanoag Tribe* and in *Narragansett* had no problem

fee-to-trust decision. *Jamul Action Committee v. Chaudhuri*, 651 Fed.Appx. 689, 690 (9th Cir. 2016) (citing *Big Lagoon Rancheria*, 789 F.3d at 953); *accord Jamul Action Committee v. Chaudhuri*, 200 F.Supp.3d 1042, 1051-1052 (E.D. Cal. 2016). That understanding comports with the Court's conclusion that taking land into trust for an Indian tribe renders the land Indian land for purposes of IGRA. If some showing additional to the fee-to-trust determination was required for land to be Indian land, a challenge to whether land is Indian land could appropriately take place outside of a challenge to the fee-to-trust determination.

determining that the Tribes exercised governmental power. The Wampanoag Tribe "established a housing program," "entered into an intergovernmental agreement with the EPA," "operat[ed] a health care clinic," offered social services and public safety services, passed ordinances, and employed a judge. *Wampanoag Tribe*, 853 F.3d at 626. The Narragansett Tribe had "established a housing authority," had government-to-government relations with the EPA, and took "advantage of the Indian Self-Determination and Education Assistance Act." *Narragansett*, 19 F.3d at 703. *See also Chaudhuri*, 802 F.3d at 286 (noting in dicta that a tribe exercised governmental power over land where it policed, fenced, posted signs on, and enacted ordinances relating to that land).

Even assuming the First and Second Circuits are correct, there is sufficient evidence in the administrative record such that it was not arbitrary or capricious for the Secretary to conclude that North Fork exercised governmental power over the Madera Site.

In this case, the Secretary was procedurally in a different position than in *Wampanoag Tribe* and *Narragansett*. Here, a determination had already been made that the Madera Site is Indian land. In *North Fork v. California*, 2015 WL 11438206 at *8, where this Court resolved cross motions for judgment on the pleadings between North Fork and California, the Court made clear that "it [was] undisputed [between California and North Fork] that … the Madera [Site is] gaming-eligible Indian land[] within the meaning of 25 U.S.C. § 2703(4) and 2719(b)(1)(A)." *Accord North Fork v. California*, 2016 WL 4208452 (E.D. Cal. Aug. 10, 2016). Indeed, that order was considered by the court-appointed mediator in selecting a proposed compact which, in turn, was considered by the Secretary in prescribing the gaming procedures at issue in this action. That decision is part of the administrative record upon which the Secretary was permitted to rely.

Next, even assuming the Secretary was required to delve beyond the Court's determination, the evidence available to the Secretary in the time before the Secretarial Procedures were issued indicated that North Fork had enacted an ordinance with respect the

Madera Site. Miskinis Decl., Doc. 37-2 at 4-6.[15] If the Court remanded the action to the Secretary for consideration of whether North Fork exercised governmental power over the Madera Site, the Secretary could only conclude that North Fork exercised governmental power over that site by legislating with respect to it.

D. Consistency with California Law

At the final stage of the remedial process, the Secretary must prescribe gaming procedures "which are consistent with the proposed compact selected by the mediator …, the provisions of [IGRA], and the relevant provisions of the laws of the State." 25 U.S.C. § 2710(d)(7)(B)(vii)(II). Plaintiffs argue in their motion (and abandon the argument in their reply) that the Secretarial Procedures are inconsistent with California law because no Compact exists governing Class III gaming. Plaintiffs are mistaken.

As a preliminary matter, Secretarial Procedures cannot be issued if a valid compact governing Class III gaming on an Indian tribe's Indian lands exists. *See* 25 U.S.C. §§ 2710(d)(3)(A), 2710(d)(7)(B)(vi-vii). To be clear, it is Plaintiffs' position that Secretarial Procedures, if issued to permit an Indian tribe in California to conduct Class III gaming, will always violate IGRA. For that proposition, Plaintiffs direct the Court to Article IV, sections 19(e) and 19(f) of the California Constitution which, collectively, preclude Nevada style gaming except by Indian tribes conducting such gaming pursuant to tribal-state compacts. Cal. Const., art. IV, § 19(e-f). Plaintiffs reason that Secretarial Procedures are not a compact and therefore gaming at the Madera Site under such procedures is inconsistent with the California Constitution. Plaintiffs cite no case authority for this proposition and it is undercut by the California Supreme Court's decision in *Hotel Employees and Restaurant Employees Intern. Union v. Davis*, 21 Cal.4th 585 (1999). In *Hotel Employees* the California Supreme Court addressed, *inter alia*, California's statutory waiver of immunity enacted in response to *Seminole Tribe of Fla. v.*

---

[15] The Court takes judicial notice of North Fork's Tribal Ordinance, designated Resolution No. 15-58, enacted on October 16, 2015. *North County Community Alliance, Inc. v. Salazar*, 573 F.3d 738, 746 (9th Cir. 2009) (taking judicial notice of a tribal ordinance.)

*Florida*, 517 U.S. 44 (1996).[16] *Hotel Employees*, 21 Cal.4th at 1010-1011. That waiver of immunity reads, in relevant part, as follows:

> [T]he State of California … submits to the jurisdiction of the courts of the United States in any action brought against the state by any federally recognized California Indian tribe asserting any cause of action arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a different Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith, the state's refusal to enter into negotiations concerning the amendment of a Tribal-State compact to which the state is a party, or to negotiate in good faith concerning that amendment, or the state's violation of the terms of any Tribal-State compact to which the state is or may become a party.

Cal. Gov't Code § 98005. The *Hotel Employees* court explained that the waiver of immunity was designed to give effect to IGRA's remedial framework, 25 U.S.C. § 2710(d)(7). *Hotel Employees*, 21 Cal.4th at 615 ("The [above-quoted portion] of section 98005, in providing the state's consent to such a suit, is obviously intended to restore to California tribes the remedy provided in IGRA.") The issuance of Secretarial Procedures is the part of the remedial process that gives it teeth. If gaming pursuant to Secretarial Procedures was not contemplated, the purpose of the remedial process—restoring leverage to tribes to sue recalcitrant states and thereby force them into a compact—would be wholly eroded. *U.S. v. Spokane Tribe of Indians*, 139 F.3d 1297, 1299-1300 (9th Cir. 1998). The State of California did not waive jurisdiction so a tribe could bring a claim without a remedy.

Moreover, there is good reason to treat Secretarial Procedures issued pursuant to § 2710(d)(7)(A)(vii) as equivalent to a Tribal-State compact for purposes of IGRA and therefore also for purposes of the relevant portions of California law designed to mirror IGRA. Section 2710(d)(1) makes clear that "[c]lass III gaming activities shall be lawful on Indian lands only if such activities are," among other things, "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect." If Secretarial Procedures prescribed pursuant to section 2710(d)(7)(A)(vii) are not treated as equivalent to a Tribal-State compact for purposes of IGRA, then the remedial process would be meaningless.

---

[16] In *Seminole Tribe*, the Supreme Court held that that in authorizing Indian tribes to sue the state pursuant to IGRA, Congress impermissibly sought to abrogate Eleventh Amendment immunity. 517 U.S. at 47. In order to avoid offending the Eleventh Amendment, a State must explicitly consent to suit. *Id*.

1  Secretarial Procedures could *never* be issued because Secretarial Procedures—necessarily issued

2  in the absence of a compact that is in effect—would *always* be "[in]consistent with … the

3  provisions of [IGRA]…." 25 U.S.C. § 2710(d)(7)(B)(vii)(I). The Court will not read IGRA to

4  have created (or the State of California to have waived immunity as to) an empty remedial

5  process. Such an outcome must be rejected.

6  E. Conclusion

7       The Secretary's issuance of Secretarial Procedures was not arbitrary, capricious, or

8  otherwise not in accordance with law for any of the reasons identified by Plaintiffs. Again, the

9  Court does not address the alleged unconstitutionality of the jurisdictional shift caused by the

10 fee-to-trust determination as that determination is not properly before this Court, as described

11 above.

12 **III. Order**

13      Based on the foregoing, IT IS HEREBY ORDERED that the Plaintiffs' motion for

14 summary judgment is DENIED and the Federal Defendants' motion for summary judgment is

15 GRANTED.

16 The Clerk of the Court is respectfully directed to enter judgment and close this case.

17

18 IT IS SO ORDERED.

19 Dated:  July 13, 2018      _____

20                 SENIOR  DISTRICT  JUDGE

21

22

23

24

25

26

27

28